UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **KATRINA HOLMES BROWNING,** | } |
| Plaintiff, | } |
| v. | } Case No.: 5:15-CV-01134-RDP |
| **CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,** | } |
| Defendant. | } |

## MEMORANDUM OF DECISION

Plaintiff Katrina Holmes Browning ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB"). *See also* 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be reversed and remanded.

**I.      Proceedings Below**

Plaintiff filed for a period of disability and DIB on April 4, 2014, alleging disability beginning on August 15, 2012. (R. 189, 215)[1]. On October 4, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 147). The hearing was conducted on July 28, 2014 in Huntsville, Alabama with ALJ Mallette Richey presiding. (R. 82). The ALJ issued her opinion on October 24, 2014 denying Plaintiff's claim for benefits. (R. 67-77). Plaintiff filed a request for review of the ALJ's decision on October 30, 2014, which was denied by the Appeals

---

[1] The Record will be cited to as (R. #).

Council on May 14, 2015, making the ALJ's decision the final decision of the Commissioner. (R. 1). Plaintiff has timely filed this action for review in this court. *See* 42 U.S.C. § 405(g).

**II.     Facts**

At the time of her hearing, Plaintiff was fifty-two years old and had an undergraduate degree and Juris Doctor. (R. 87, 90). Past work history includes employment as a private coordinator, quality specialist, configuration manger, and (unofficially) legal assistant. (R. 93-96). She alleges she has experienced disabling migraines and cannot find employment because of her problems. (R. 92).

Plaintiff began seeing Dr. S. Aggarwal on April 7, 2003, and complained of neck pain and headaches. (R. 321). She claims these started approximately eleven years prior to her visit. (*Id.*). Plaintiff had already been diagnosed with migraines and was then taking Imitrex and Hydrocodone daily for pain relief with good results. (*Id.*). Her pain was concentrated on the right side of her head and neck and she reported it at a 1/10 during the visit, and 10/10 at its worst. (*Id.*). Dr. Aggarwal noted that aggravating factors of pain included lights and smells, and alleviating factors included medication and sleep. (*Id.*). Examination revealed 5/5 motor strength and Plaintiff was able to heel and toe walk. (R. 322). Other than some tenderness in the right trapezius and right cervical paraspinal muscles, the physical examination revealed no abnormalities. (*Id.*). Plaintiff reported having a slight problem with sleep and headaches and her medication was switched to Lortab. (*Id.*).

Dr. Aggarwal continued regular check-ups with Plaintiff after April 2003. In May 2003, Plaintiff had improved sleep and good relief from pain with the Lortab. (R. 320). In July 2003, Plaintiff continued to have improved sleep, though she was having some knee pain. (R. 319). In October 2003, Plaintiff was having pain in her cervical and thoracic areas, and Dr. Aggarwal

planned to obtain an MRI. (R. 318). In December 2003, Dr. Aggarwal indicated that Plaintiff's thoracic MRI was normal. (R. 316). Plaintiff had continued benefit with her medication and was interested in obtaining more Imitrex. (*Id.*). Dr. Aggarwal's impression was that Plaintiff had migraine headaches, cervical MPS, and thoracic pain. (*Id.*).

In August 2004, Plaintiff reported significant benefit from her medications and was enjoying her quality of life. (R. 315). Dr. Aggarwal observed that all of Plaintiff's issues appeared stable at that time. (*Id.*). In January 2005, Dr. Aggarwal noted Plaintiff had continued benefit from the medications, but was suffering from occasional breakthrough pain. (R. 314). The same was reported in June 2005 (Dr. Aggarwal increased the number of Lortab and Imitrex prescribed). (R. 313). Between this visit and her December 2005 visit with Dr. Aggarwal, Plaintiff was prescribed Flexeril. (R. 312-13). Her December 2005 medical records indicate that Plaintiff had decreased her use of Imitrex and Flexeril, and that she was doing well. (R. 312).

In June 2006, Plaintiff again complained about breakthrough pain. (R. 311). She also reported that she was sleeping poorly, and having intense muscle spasms in her cervical spine and shoulder muscle. (*Id.*). Her Lortab prescription was increased to forty pills per month and Botox treatment was recommended. (*Id.*). In October 2006, Plaintiff returned complaining of pain in her neck and right arm. (R. 310). In January 2007, Plaintiff stopped having pain in her arm, and experienced continued benefits from her medications. (R. 309). In July 2007, Plaintiff returned for Botox injection treatment and reported that she continued to experience poor sleep and cramping sensations in her shoulder. (R. 307). In January 2008, Plaintiff reported significant relief (50%) after the Botox treatment and held off on receiving more. (R. 306). Her medical records indicate she had improved sleep at that time. (*Id.*).

Plaintiff continued to receive continued benefit from the medications from June 2008 to April 2011, but reported to have good days and bad days during that time. (R. 299-302). Plaintiff's sleep patterns also alternated between improved sleep and poor sleep during that time as well. (*Id.*). Dr. Aggarwal switched Plaintiff's medication from Imitrex to Relpax because Plaintiff reported the latter helped her more. (R. 301). On July 5 and 12, 2011, Plaintiff made consultative visits with Dr. Morris B. Seymour of the Orthopaedic Center who reviewed a July MRI from BioImaging of Huntsville and identified significant cervical stenosis. (R. 362, 366).

In October 2011, Dr. Aggarwal reviewed the MRI from July and identified degenerative disk disease in Plaintiff's cervical area. (R. 289, 298). Plaintiff was experiencing tenderness in her cervical paraspinal muscles and a 25% reduced range of motion in the cervical spine. (R. 298). Plaintiff's last visit to Dr. Aggarwal was in October 2012, during which when she indicated continued benefit with medication and a current pain level of 4/10, with moderate tenderness remaining in her cervical paraspinal muscle. (R. 296).

In December 2011, Plaintiff visited Dr. Seymour who noted that it was difficult to determine whether the issue with her neck was connected to her headaches. (R. 355). Dr. Seymour made arrangements for a cervical epidural. (*Id.*). On January 4 and November 14, 2012, Plaintiff visited the Surgery Center of Huntsville for an interlaminar epidural steroid injection. (R. 326, 334). On forms she filled out during each visit, Plaintiff indicated that she was suffering from migraine headaches. (R. 330, 338). In December 2012, Dr. Seymour discussed with Plaintiff that surgery would have some chance of helping her with her headaches but that he was not sure it would result in resolution of all her symptoms. (R. 343). Plaintiff opted to see another physician for a second opinion. (*Id.*).

Plaintiff began seeing Dr. Usha Nuthi on December 13, 2012. (R. 406).  She reported to Dr. Nuthi that she was still having daily migraines lasting for five hours at a time and that she had a migraine that morning. (*Id.*).  She indicated that her pain was a 10/10. (*Id.*).  Plaintiff indicated that some of her irritating factors were barometric pressure change, change in season, change in weather, depression, missing a meal, fatigue, stress, cleaning products containing ammonia, exercise, light, noise, and perfumes. (*Id.*).  Upon examination, Dr. Nuthi found no abnormalities with Plaintiff. (R. 407).  Dr. Nuthi indicated that Plaintiff should avoid caffeinated products and foods which can trigger headaches such as chocolate, cheese, wine, and tomato based products. (*Id.*).  In addition, Dr. Nuthi recommended that Plaintiff should avoid tobacco products and cleaning agents containing ammonia. (*Id.*).

Plaintiff underwent an EEG with Dr. Nuthi in February 2013, but the results from the examination revealed no abnormalities. (R. 409-10).  In March 2013, Plaintiff returned to Dr. Nuthi for Botox treatment. (R. 412).  Her medical records indicated that there were no changes in Plaintiff's migraines since her last visit. (*Id.*).  During her April 2013 follow-up, Plaintiff reported that the Botox treatment had decreased the number of headaches she was having. (R. 414).  Dr. Nuthi developed a plan to transition Plaintiff off the medications prescribed to her by other doctors. (*Id.*).

Between March and May 2013, in addition to seeing Dr. Nuthi, Plaintiff visited Dr. Sanjay Malhorta at the Ardmore Behavioral Clinic. (R. 275-389).  During her March visit, Plaintiff indicted to Dr. Malhorta that she was having migraines three times per week, was unable to sleep, and had low energy. (R. 388).  On April 4 and 24, 2013, Plaintiff visited Dr. Malhorta but did not indicate any symptoms related to migraines; instead, her complaints centered on her depression and poor energy. (R. 380-87).  But by the time of her May 2013 visit,

Plaintiff was again complaining of fatigue, headaches, neck pain, and constantly needing to sleep. (R. 376).

Plaintiff returned to Dr. Nuthi on June 4, 2013. (R. 416). Dr. Nuthi indicated that Plaintiff's condition was "good, no changes." (*Id.*). On June 10, however, Plaintiff returned to his office complaining of a migraine she had experienced for four days. (R. 417). Plaintiff was given Botox treatment. (R. 417-18).

In July 2013, Plaintiff was examined by consultants William D. McDonald, Ph.D., and Dr. Prem K. Gulati. (R. 391-99). Dr. Gulati found no abnormalities other than those indicated by Plaintiff's past medical records and indicated that her only limitation was that she could not do heavy lifting. (R. 399). Dr. McDonald found the same based upon his evaluation and deferred to the findings of previous treating physicians for the evaluation of chronic neck, back, and head pains. (R. 393-94). At the time of these evaluations, Plaintiff was taking several medications including Imitrex, Hydrocodone, Lortab, Quetiapine, Cyclobenzaprine, Citalopram, and Trazadone. (R. 395, 397).

In October 2013, Plaintiff received another Botox treatment from Dr. Nuthi. (R. 420). Plaintiff indicated that she was having three to four migraines per week. (R. 420-21). The medical records indicate that October 2013 was Plaintiff's last visit to Dr. Nuthi.

One month prior to her last visit with Dr. Nuthi, in September 2013, Plaintiff visited Dr. Rao Nadella for her migraines. (R. 448). She indicated that her migraines had been progressively worsening over the past two years. (*Id.*). Dr. Nadella's examination indicated no abnormalities. (R. 447). In November 2013, Plaintiff again visited Dr. Seymour. (R. 423). After discussing the likelihood of relief from her headaches with surgery (which was truly uncertain),

6

Plaintiff decided that she would undergo surgery.[2] (*Id.*). The last recorded visit to Dr. Nadella was on December 2, 2013. (R. 446). Plaintiff indicated that she had experienced a migraine throughout the previous weekend, but medication had helped some. (*Id.*).

In March 2014, Plaintiff presented to Dr. Eric R. Beck at the Center for Nerve Studies and Rehabilitation for an evaluation and to receive a Botox treatment for her migraines. (R. 428). On May 12, 2014, Plaintiff again saw Dr. Beck, and her chief complaint was chronic pain in her head and elsewhere. (R. 429). The severity of Plaintiff's pain was determined to be moderate at that time. (*Id.*). The medical record from her May 6, 2014 visit indicates that Plaintiff received a Botox treatment. (*Id.*). Also in May, Dr. Nuthi filled out a pain questionnaire (which forms one of the main issues of this appeal) indicating that Plaintiff was virtually incapacitated by her pain, fatigue, and weakness. (R. 402-04). Specifically, the questionnaire indicated that Plaintiff's pain, fatigue, and weakness were incapacitating; physical activity would increase the pain, fatigue, and weakness to the point of bedrest; and that medication to treat her conditions rendered Plaintiff unable to function at a productive level. (R. 400-01). Additionally, the questionnaire indicated that Plaintiff could only sit for one hour per day, and stand and walk for zero hours per day. (R. 404). Plaintiff was restricted to occasional pushing, pulling, climbing and balancing, fine manipulations, bending, stooping, and reaching, but that she could never perform gross manipulations. (*Id.*).

On June 10, 2014, Plaintiff visited Dr. Beck for a pain evaluation. (R. 432). She indicated that she was independent, not housebound, walked twenty minutes per day, and that her average

---

[2] The record does not indicate whether Plaintiff was planning on following through with surgery. The May 12, 2014 record from Dr. Beck seems to indicate that Plaintiff was trying to avoid the surgery. (R. 429). No medical records are included mentioning surgery other than the records already mentioned.

monthly pain was a 3/10.[3] (R. 432).  In July 2014, Dr. Beck administered a Botox treatment and stated that Plaintiff was unable to work due to her pain. (R. 444).

## III. ALJ Decision

Disability under the Act is determined under a five-step test.  20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is done for pay or profit.  20 C.F.R. § 404.1572(b).  If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability.  20 C.F.R. § 404.1520(b).  Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability.  (*Id*.).  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.   If such criteria are met, the claimant is declared disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work.  20 C.F.R.

---

[3] The record from the June 10, 2014 visit indicates a thirty-three out of ten average pain, but this is likely an error because the notes say the pain was down from ten out of ten without medications. (R. 432).

8

§ 404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled.  (*Id*.).  If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.  20 C.F.R. § 404.1520(a)(4)(v).  In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience.  20 C.F.R. § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

At step one of the analysis, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 5, 2012, her alleged onset date of disability. (R. 69).  At step two, the ALJ found that Plaintiff had five severe impairments: degenerative disk disease of the spine, osteoarthritis, migraines, affective disorder, and anxiety disorder. (R. 69).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the Listing. (R. 69-70).  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  At step four, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following exceptions: Plaintiff may only lift or carry twenty pounds occasionally, and ten pounds frequently; she may stand or walk for six hours in an eight hour workday and sit for a total of six hours; she can occasionally push or pull with both lower extremities; she may occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; she can frequently balance, stoop, kneel, crouch, crawl, and perform occasional overhead reaching; she should avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, and perfumes; she can work with

moderate exposure such as in an office; she can perform handling, fingering, and feeling of objects frequently; she can understand and remember simple instructions and attend simple tasks for two hour segments over an eight hour workday; her contact with public should be causal and criticism needs to be given in a non-confrontational manner; and changes to her work setting need to be gradually introduced and infrequent. (R. 70-71). Further, the ALJ concluded that Plaintiff was unable to perform any of her past relevant work. (R. 70-76). Finally, at step five, after considering Plaintiff's RFC, age, education, and work experience, the ALJ found that other jobs existing in significant numbers both regionally and nationally could be performed by Plaintiff. (R. 76-77). As a result, the ALJ concluded that Plaintiff was not disabled and denied Plaintiff's claim for DIB. (R. 77).

## IV. Plaintiff's Argument for Reversal

Plaintiff contends the ALJ erred by discrediting the opinions of both her treating and examining physicians. Specifically, Plaintiff points to five errors. Plaintiff asserts that: (1) the ALJ failed to properly assess whether Plaintiff's tarsal tunnel syndrome and degenerative joint disease were severe impairments (Pl's Br. 7);[4] (2) the ALJ's RFC finding was inconsistent with determinations made by one of Plaintiff's treating physicians, Dr. Usha Nuthi (Pl's Br. 7); (3) the ALJ should have adopted the functional limitations assessed by examining physician, Dr. Larry H. Dennis, but failed to do so (Pl's Br. 9); (4) the ALJ failed to obtain a medical source opinion by a medical expert pursuant to 20 C.F.R. § 404.1529(b) (Pl's Br. 10); and (5) the ALJ failed to consider all of Plaintiff's impairments in combination in step three of the disability analysis.

## V. Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838

---

[4] The "Memorandum of Law in Support of Plaintiff's Argument" will be cited to as (Pl's Br. #).

(11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## VI.   Discussion

After careful review and for the reasons stated below, the court concludes that the ALJ improperly discredited a treating physician's opinion, and the ALJ's decision is due to be reversed and remanded.

### A.   Whether the ALJ Properly Discredited Portions of a Treating Physician's Determinations Regarding Plaintiff's Physical Limitations.

The initial question raised by Plaintiff on appeal is whether the ALJ properly discredited portions of a treating physician's opinion. Plaintiff argues that substantial weight should be

placed on the medical opinions of treating physician, Dr. Usha Nuthi, and that the ALJ erred in discrediting Dr. Nuthi's responses in the pain questionnaire and physical capacities evaluation. (Pl's Br. 10; R. 285-86, 400-04). The court agrees.

In reviewing the determination of the Commissioner, this court will review the record as a whole to ensure that the decision to deny benefits is supported by substantial evidence. 42 U.S.C. § 405(g); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It must be more than a mere scintilla of evidence. (*Id.*).

A treating physician's opinion "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). *See* 20 C.F.R. § 404.1527(d)(2). It is well established that good cause is found if (1) the physician's opinion is not bolstered by the evidence, (2) the evidence supported a contrary finding, or (3) the opinion is conclusory or inconsistent with the physician's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1241(11th Cir. 2004); *Lewis*, 125 F.3d at 1440. "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 357 F.3d at 1241. Failure to give weight given to the opinion and articulate reasons constitutes reversible error. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

Here, the ALJ listed two reasons for discrediting Dr. Nuthi's opinion, but neither of them fall squarely within the acceptable reasons set out in *Phillips* and *Lewis*. First, the ALJ stated that Dr. Nuthi's May 2014 assessment of Plaintiff's limitations were far in excess of what might be expected to result from impairments. He found Dr. Nuthi's opinion unsupported by the

12

evidence, and afforded the opinion little weight. (R. 73-74).  Plaintiff asserts that an ALJ's "expectations" are not one of the three acceptable reasons, and, here, the ALJ's assessments improperly encroach into the realm of "sit and squirm" jurisprudence. *See Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982).

Second, the ALJ concluded Dr. Nuthi's opinion is not supported by substantial evidence. Dr. Nuthi was Plaintiff's treating physician and this fact was acknowledged by the ALJ.  (R. 73). Dr. Nuthi indicated in a pain questionnaire that Plaintiff was totally restricted due to incapacitating pain and side effects from medication. (R. 400-04).  The ALJ purported to discredit that opinion by pointing to medical records from Dr. Nuthi indicating that the Botox injections Plaintiff received were decreasing the number of headaches she was having. (R. 73, 412-20).  The ALJ found that throughout the time that Plaintiff visited Dr. Nuthi, the only functional limitations recommended were that Plaintiff avoid caffeine, certain foods that can trigger headaches, cleaning agents containing ammonia, and nicotine and tobacco products. (R. 73, 406-19).  The ALJ also noted a medical consultation in July 2013 with Dr. Prem K. Gulati, where the only limitation assigned was that Plaintiff could not do heavy lifting without undergoing surgery. (R. 73, 398).  The examination resulted in normal findings. (R. 73, 397-99).

But here's the problem.  In the decision, the ALJ gave very limited attention to Plaintiff's treatment by Dr. Nuthi.  The ALJ's reasons in support of discrediting Dr. Nuthi's opinion are off the mark based upon a review of material portions of Dr. Nuthi's medical records. *See Maffia v. Comm'r of Soc. Sec.*, 291 F. App'x 261, 264 (11th Cir. 2008) (explaining that failure to address parts of a medical opinion that support the ultimate issue of the claimant's physical limitations was a mischaracterization of the evidence).  However, a mischaracterization is not always grounds for reversal. *See Hoffman v. Astrue*, 259 F. App'x 213, 217 (11th Cir. 2007) (implying

that even if the ALJ misstated or mischaracterized medical findings, such actions are immaterial if substantial evidence supports the ultimate conclusion of the ALJ).  In stating the above reasons in support of the decision to reject Dr. Nuthi's opinion, the ALJ failed to acknowledge that during Plaintiff's June 2013 visit with Dr. Nuthi, she had been having a migraine for the past four days and requested additional Botox treatment. (R. 414-17).  Though medical records indicate that Plaintiff's migraines decreased with Botox, the same medical evidence also shows that Plaintiff continued to suffer from migraines up to four times per week. (R. 420).  The history of treatment for migraines in the current record reaches back to 2003. (R. 321).  Medical records since then reflect an increasing frequency of occurrence of the migraines.  Medical records do not show that any physician has discredited the complaints by Plaintiff, nor that any medical testing discredited her complaints.

Additionally, a reading of the ALJ's opinion and the memorandum in support of the Commissioner's decision suggest that certain important factors were not taken into account when assigning weight to Dr. Nuthi's opinion.  When a treating physician's opinion is discredited, the ALJ must consider several factors in making a determination as to how much weight to afford the opinion, including the treating physician's specialization versus other sources. 20 C.F.R. § 404.1527(c)(5).  Here, the ALJ's opinion implies that the July 2013 examination of Plaintiff by Dr. Prem Gulati of the Sparkman Medical Clinic was used to discredit Dr. Nuthi. (*See* R. 73). The record does not say whether Dr. Gulati is a neurologist.  It does, however, indicate that Dr. Nuthi is a neurologist. (*Id.*).  It is at best unclear from the ALJ's opinion why more weight was assigned to Dr. Gulati's opinion as compared to Dr. Nuthi's.  The evidence of record seems to support the opinion of Dr. Nuthi.  But it is not this court's job to reweigh the evidence.  Rather,

the court must ensure that substantial evidence supports the ALJ's conclusion and that the law was correctly applied.[5]

To be sure, the record can be read to contain inconsistencies about medication side effects. Such inconsistencies may support an ALJ's conclusion that the opinion of a treating physician is due to be rejected. Throughout the course of office visits with Dr. Nuthi, no symptoms of medication appear. The notes indicate fatigue and lack of sleep; however, "side effects" of Plaintiff's medication do not appear until the oral hearing with the ALJ, where Plaintiff states that her Imitrex makes her go to sleep. (R. 97). But the ALJ's failure to address this issue head on does not help this court in finding whether substantial evidence supports the ALJ's findings.

Having reviewed all the evidence of record, this court agrees with Plaintiff on this issue. Without further explanation by the ALJ as to why Dr. Nuthi's opinion was discredited, substantial evidence does not appear to support the ALJ's conclusion. To be clear, this court is not suggesting that Plaintiff is disabled or that Dr. Nuthi's opinion should be afforded great weight. But an ALJ must elaborate more than was presented here about the reasons for assigning little weight to a treating physician's opinion. The court makes no further findings on any of the additional issues raised by Plaintiff.

## VII. Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is not supported by substantial evidence and the proper legal standards were applied in reaching this

---

[5] As an example, the evidence of record in the form of a statement by Plaintiff's former boss indicates that Plaintiff was suffering from incapacitating pain. Statements such as these are relevant. 20 C.F.R. § 404.1513(d)(4). No indication is made in the ALJ's opinion whether the statement was considered. The statement is consistent with the medical record and tends to support the opinion of Dr. Nuthi. The statement suggests that towards 2013, Plaintiff's migraines became increasingly debilitating, which is consistent with Dr. Nuthi's 2013 medical records.

determination.  The Commissioner's final decision is therefore due to be reversed and remanded.

A separate order in accordance with this memorandum of decision will be entered.

      **DONE** and **ORDERED** this June 24, 2016.

                                                   **R. DAVID PROCTOR**
                                                   UNITED STATES DISTRICT JUDGE